Ted D. Conley, Esq. [CA Bar No. 202519]
ted@dehnadiconley.com
Noushin Dehnadi, Esq. [CA Bar No. 208312]
noushin@dehnadiconley.com
DEHNADI & CONLEY, LLP
One Park Plaza, Sixth Floor
Irvine, California  92614
Tele.: (949) 852-7301/Fax: (949) 852-7302

Attorneys for Attorneys of Record for
Defendants and Counterclaimants CHRONIC
TACOS HUNTINGTON BEACH, INC.,
CHRONIC TACOS CORONA DEL MAR,
INC., ROB SLEENHOF and LOES SLEENHOF



2010 NOV 12  PM 3: 16

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY

FILED

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRONIC TACOS ENTERPRISES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>CHRONIC TACOS HUNTINGTON BEACH, INC., a California corporation; ROB SLEENHOFF, an individual; LOES SLEENHOFF, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO. SACV10-01414 DOC (RNBx)  *AMENDED*

**DEFENDANT CHRONIC TACOS HUNTINGTON BEACH, INC., ROB SLEENHOF AND LOES SLEENHOF'S ANSWER TO COMPLAINT AND COUNTERCLAIM OF CHRONIC TACOS HUNTINGTON BEACH, INC., CHRONIC TACOS CORONA DEL MAR, INC., ROB SLEENHOF AND LOES SLEENHOF**

**DEMAND FOR JURY TRIAL**

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

1

ANSWER TO COMPLAINT AND COUNTERCLAIM

CHRONIC TACOS )
HUNTINGTON BEACH, INC., a )
California corporation; CHRONIC )
TACOS CORONA DEL MAR, )
INC., a California corporation; )
ROB SLEENHOF, an individual; )
LOES SLEENHOF, an individual, )
                              )
Counterclaimants, )
                              )
v. )
                              )
CHRONIC TACOS )
ENTERPRISES, INC., a California )
corporation; Dan Bielo, an )
individual; Randall Wyner, an )
individual; and ROES 1-20, )
inclusive, )
                              )
Counterdefendants. )

COMES NOW DEFENDANTS CHRONIC TACOS, HUNTINGTON BEACH, INC., Rob Sleenhof (erroneously sued as "Rob Sleenhoff") and Loes Sleenhof (erroneously sued as "Loes Sleenhoff") and answers the Complaint of CHRONIC TACOS ENTERPRISES, INC., as follows:

## INTRODUCTION

1.    Defendants deny the allegations of Paragraph 1.

2.    Defendants deny the allegations of Paragraph 2.

3.    Defendants admit that Plaintiff seeks the relief stated in Paragraph 3 but denies that any of the grounds stated therefor are true.

## PARTIES

4.    Defendants lack sufficient knowledge to admit or deny the allegations concerning the corporate status of Plaintiff in Paragraph 4.  Defendants deny that Plaintiff was a franchisor as alleged in Paragraph 4.

5.    Defendants admit the allegations of Paragraph 5.

6.    Defendants admit the allegations of Paragraph 6.

7.    Defendants admit the allegations of Paragraph 7 but deny that this

1    Court has personal jurisdiction over Defendant Loes Sleenhof.

2        8.      Defendants deny the allegations of Paragraph 8.

3        9.      Defendants deny the allegations of Paragraph 9.

4        10.     Defendants admit that Plaintiff makes the collective reference alleged

5    in Paragraph 10.

6                        **JURISDICTION AND VENUE**

7        11.     Defendants lack sufficient knowledge to admit or deny the allegations

8    of Paragraph 11.

9        12.     Defendants lack sufficient knowledge to admit or deny the allegations

10   of Paragraph 12.

11                       **COMMON ALLEGATIONS**

12   **A.    The CTE System and Marks**

13       13.     Defendants lack sufficient knowledge to admit or deny the allegations

14   of Paragraph 13.

15       14.     Defendants lack sufficient knowledge to admit or deny the allegations

16   of Paragraph 14.

17       15.     Defendants lack sufficient knowledge to admit or deny the allegations

18   of Paragraph 15.

19       16.     Defendants lack sufficient knowledge to admit or deny the allegations

20   of Paragraph 16.

21       17.     Defendants lack sufficient knowledge to admit or deny the allegations

22   of Paragraph 17.

23       18.     Defendants deny the allegations of Paragraph 18.

24           a.     Defendants deny the allegations of Paragraph 18(a).

25           b.     Defendants deny the allegations of Paragraph 18(b).

26           c.     Defendants deny the allegations of Paragraph 18(c).

27           d.     Defendants deny the allegations of Paragraph 18(d).

28           e.     Defendants deny the allegations of Paragraph 18(e).

ANSWER TO COMPLAINT AND COUNTERCLAIM

f.     Defendants deny the allegations of Paragraph 18(f).

g.     Defendants deny the allegations of Paragraph 18(g).

h.     Defendants deny the allegations of Paragraph 18(h).

19.    Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 19.

20.    Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 20.

21.    Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 21.

22.    Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 22.

23.    Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 23.

**B.**    **Defendants' Temporary License Was Terminated**

24.    Defendants deny the allegations of Paragraph 24.

25.    Defendants deny the allegations of Paragraph 25.

26.    Defendants deny the allegations of Paragraph 26.

27.    Defendants deny the allegations of Paragraph 27.

28.    Defendants admit that they do not use the CTE System.  Defendants deny the remaining allegations of Paragraph 28.

29.    Defendants deny the allegations of Paragraph 29.

30.    Defendants deny the allegations of Paragraph 30.

**E.**    **The Defendants' Brazen Infringement**

31.    Defendants deny the allegations of Paragraph 31.

32.    Defendants deny the allegations of Paragraph 32.

/ / / /

/ / / /

/ / / /

ANSWER TO COMPLAINT AND COUNTERCLAIM

## FIRST CLAIM FOR RELIEF

### For Trademark Infringement - - 15 U.S.C. §§ 1114(a)

### (Against All Defendants)

33. Defendants repeat, reallege and incorporate by reference the preceding Paragraphs of its Answer as though fully set forth and plead herein.

34. Defendants deny the allegations of Paragraph 34.

35. Defendants deny the allegations of Paragraph 35.

36. Defendants deny the allegations of Paragraph 36.

37. Defendants deny the allegations of Paragraph 37.

38. Defendants deny the allegations of Paragraph 38.

39. Defendants deny the allegations of Paragraph 39.

40. Defendants deny the allegations of Paragraph 40.

41. Defendants deny the allegations of Paragraph 41.

42. Defendants deny the allegations of Paragraph 42.

43. Defendants deny the allegations of Paragraph 43.

## SECOND CLAIM FOR RELIEF

### For False Designation/Unfair Competition - - I5 U.S.C. § 1125(a)

### (Against All Defendants)

44. Defendants repeat, reallege and incorporate by reference the preceding Paragraphs of its Answer as though fully set forth and plead herein.

45. Defendants deny the allegations of Paragraph 45.

46. Defendants deny the allegations of Paragraph 46.

47. Defendants deny the allegations of Paragraph 47.

48. Defendants deny the allegations of Paragraph 48.

49. Defendants deny the allegations of Paragraph 49.

50. Defendants deny the allegations of Paragraph 50.

51. Defendants deny the allegations of Paragraph 51.

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

## THIRD CLAIM FOR RELIEF

### For Common Law Trademark Infringement

### (Against All Defendants)

52.     Defendants repeat, reallege and incorporate by reference the preceding Paragraphs of its Answer as though fully set forth and plead herein.

53.     Defendants admit only that the Court has the jurisdiction alleged in Paragraph 53 but deny the existence of any valid claim.

54.     Defendants deny the allegations of Paragraph 54.

55.     Defendants deny the allegations of Paragraph 55.

56.     Defendants deny the allegations of Paragraph 56.

57.     Defendants deny the allegations of Paragraph 57.

58.     Defendants deny the allegations of Paragraph 58.

59.     Defendants deny the allegations of Paragraph 59.

60.     Defendants deny the allegations of Paragraph 60.

61.     Defendants deny the allegations of Paragraph 61.

62.     Defendants deny the allegations of Paragraph 62.

## FOURTH CLAIM FOR RELIEF

### For Unfair Business Practices

### (CA Bus. & Prof. Code §§ 17200, *et seq.*)

### (Against All Defendants)

63.     Defendants repeat, reallege and incorporate by reference the preceding Paragraphs of its Answer as though fully set forth and plead herein.

64.     Defendants deny the allegations of Paragraph 64.

65.     Defendants deny the allegations of Paragraph 65.

66.     Defendants deny the allegations of Paragraph 66.

67.     Defendants deny the allegations of Paragraph 67.

////

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

## AFFIRMATIVE DEFENSES

68.   **FIRST AFFIRMATIVE DEFENSE**

**FAILURE TO JOIN INDISPENSABLE PARTIES**: Plaintiff has failed to join indispensable parties, including but not limited to Doe Defendants Tommy Chau and Lisa Chau.

69.   **SECOND AFFIRMATIVE DEFENSE**

**FAILURE TO MITIGATE**: Plaintiff's claims are barred in whole or in part because Plaintiff failed to mitigate the claim through arbitration, good faith and fair dealing, honest business practices, clear and reasonable communication and other means.

70.   **THIRD AFFIRMATIVE DEFENSE**

**FAILURE TO STATE A CLAIM**: The allegations of Plaintiff's Complaint are insufficient to state an actionable claim at law or equity.

71.   **FOURTH AFFIRMATIVE DEFENSE**

**INNOCENT INTENT**: Plaintiff's claims or damages, if any, are limited by Defendants' innocent intent and good faith.

72.   **FIFTH AFFIRMATIVE DEFENSE**

**ESTOPPEL**: Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

73.   **SIXTH AFFIRMATIVE DEFENSE**

**WAIVER**: Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

74.   **SEVENTH AFFIRMATIVE DEFENSE**

**UNCLEAN HANDS**: Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

75.   **EIGHTH AFFIRMATIVE DEFENSE**

**ADEQUATE REMEDY AT LAW**: Plaintiff's claims for equitable relief are improper due to the existence of an adequate remedy at law.

7

ANSWER TO COMPLAINT AND COUNTERCLAIM

76. **NINTH AFFIRMATIVE DEFENSE**

**LACHES**: Plaintiff's claims are barred in whole or in part by the doctrine of laches

77. **TENTH AFFIRMATIVE DEFENSE**

**INVALID TRADEMARK**: The marks alleged in the Complaint, including but not limited to the allegedly registered marks (Registration Nos. 3317453 and 2627712), are invalid and not registerable.

78. **ELEVENTH AFFIRMATIVE DEFENSE**

**BAD FAITH**: At all times relevant, Defendants acted reasonably and exercised good faith, while Plaintiff has exercised bad faith.

79. **TWELFTH AFFIRMATIVE DEFENSE**

**FRAUD**: Plaintiff should be barred from any recovery due to their fraudulent acts and omissions.

80. **THIRTEENTH AFFIRMATIVE DEFENSE**

**DEFECTIVE NOTICE**: All alleged Notices sent by Plaintiff were defective.

81. **FOURTEENTH AFFIRMATIVE DEFENSE**

**CONSENT**: Plaintiff has consented to and/or acquiesced in Defendants' use of Plaintiff's trademarks, trade names and trade dress subsequent to the issuance of the Notices and letters set forth in the Complaint.

82. **FIFTEENTH AFFIRMATIVE DEFENSE**

**ILLEGAL RESTRAINT ON TRADE**: The actions of Plaintiff constitute unreasonable and illegal restraints of trade and anti-competitive practices in violation of state and federal anti-trust laws.

83. **SIXTEENTH AFFIRMATIVE DEFENSE**

**OFFSET**: The claims and damages suffered by Defendants and caused by Plaintiff give rise to an offset and exceed any amounts that Plaintiff are allegedly owed.

ANSWER TO COMPLAINT AND COUNTERCLAIM

84.    **SEVENTEENTH AFFIRMATIVE DEFENSE**

**NO IRREPARABLE HARM:** There is no cognizable threat of irreparable harm to Plaintiff to justify granting any injunctive relief. Any harm to the trademarks have been caused the Plaintiff's gross mismanagement of their alleged franchise system and failure to advertise locally to benefit its franchisees, including but not limited to Defendants herein, and the failure to implement a hardship program.

85.    **EIGHTEENTH AFFIRMATIVE DEFENSE**

**STATUTE OF LIMITATIONS:** The claims asserted by Plaintiff are barred or reduced by the applicable statute of limitations.

86.    **NINETEENTH AFFIRMATIVE DEFENSE**

**FAILURE TO PERFORM CONDITIONS:** Plaintiff has failed to perform the conditions necessary to give rise to any contractual or other alleged obligations on the part of Defendants, and thus Plaintiff is estopped from claiming that the answering Defendants breached any such obligation.

87.    **TWENTIETH AFFIRMATIVE DEFENSE**

**MISREPRESENTATION:** Any of the conduct of Defendants or Defendants' agents which is alleged to be unlawful or wrongful was taken as a result of misrepresentations by Plaintiff.

88.    **TWENTY-FIRST AFFIRMATIVE DEFENSE**

**JUSTIFICATION AND PRIVILEGE:** The Complaint, and each cause of action contained therein, is barred because the alleged acts attributed to the responding Defendants, if any, are justified and privileged.

89.    **TWENTY-SECOND AFFIRMATIVE DEFENSE**

**LACK OF DAMAGES:** Plaintiff has not suffered any damages as a result of any actions taken by Defendants or Defendants' agents, and is thus barred from asserting any cause of action against the responding Defendants.

/ / / /

ANSWER TO COMPLAINT AND COUNTERCLAIM

90. **TWENTY-THIRD AFFIRMATIVE DEFENSE**

**PLAINTIFF OMISSION**: Defendants allege that the damages for which the Plaintiff seeks to hold Defendants liable, resulted in whole and/or in part from Plaintiff's acts or omissions and Defendants are in no way responsible or liable to Plaintiff for its own wrongful or negligent acts or omissions.

91. **TWENTY-FOURTH AFFIRMATIVE DEFENSE**

**THIRD PARTY LIABILITY**: Defendants allege that the damages for which Plaintiff seeks to hold Defendants liable resulted in whole or in part from the negligence, deliberate, intentional, reckless or unlawful acts or omissions of third parties, including the agents of Plaintiff, and Defendants are in no way responsible for or liable to Plaintiff for any such acts or omissions on the part of said third parties.

92. **TWENTY-FIFTH AFFIRMATIVE DEFENSE**

**APPORTIONMENT OF LIABILITY**: Defendants allege that if it should be found in any manner legally responsible for damages, if any, purportedly sustained by Plaintiff or any other party or parties to this action, then such damages were proximately caused, or contributed to by the other party or parties to this action, or other persons or entities not presently parties to this action, and it is necessary that the proportionate degree of negligence or fault of each and every person or entity, whether made parties to this action or not, be determined and prorated and that any judgment that might be entered against Defendants be reduced by that degree of fault found to exist as to said other persons or entities.

93. **TWENTY-SIXTH AFFIRMATIVE DEFENSE**

**COLLATERAL ESTOPPEL / RES JUDICATA**: Defendants allege that the Plaintiff and/or the issues/claims alleged therein are barred by the doctrines of collateral estoppel and/or res judicata.

/ / / /

10

ANSWER TO COMPLAINT AND COUNTERCLAIM

94.   **TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

**CONDUCT OF OTHER DEFENDANTS**: Defendants are not liable for the conduct or omissions of any of the other named or unnamed Defendants in this matter.

95.   **TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

**INTERVENING ACTS**: The risks, injuries, damages that allegedly occurred, along with the actions of Plaintiff, were not created or controllable by Defendants and could not be reduced or eliminated by Defendants and/or were caused by intervening or superseding acts or omissions over which Defendants had not control and for which Defendants can not be held responsible.

96.   **TWENTY-NINTH AFFIRMATIVE DEFENSE**

**VAGUE, AMBIGUOUS AND UNCERTAIN**: The Complaint is vague, ambiguous, and uncertain. Therefore, Defendants reserve the right to amend this Answer in the event any of the allegations presented by Plaintiff are subsequently clarified or modified.

97.   **THIRTIETH AFFIRMATIVE DEFENSE**

**LACK OF STANDING**: Defendants allege that Plaintiff lacks standing to bring, prosecute, and/or maintain this action.  On information and belief, Plaintiff does not own the right to some, or all, of the alleged marks.

98.   **THIRTY-FIRST AFFIRMATIVE DEFENSE**

**AGREEMENT**: Any acts performed by Defendant that are alleged to be wrongful were performed with the permission of Plaintiffs and Defendant had a contractual right to perform such acts.

99.   **THIRTY-SECOND AFFIRMATIVE DEFENSE**

**PREVENTION OF PERFORMANCE**: Any alleged failure of Defendants to perform an obligation or refrain from some act, although such failure is expressly denied, was a result of Plaintiff's prevention of performance.

////

11

ANSWER TO COMPLAINT AND COUNTERCLAIM

100. **THIRTY-THIRD AFFIRMATIVE DEFENSE**

**ABANDONMENT OF MARK**: On information and belief, Plaintiff has abandoned its alleged trademark(s).

101. **THIRTY-FOURTH AFFIRMATIVE DEFENSE**

**FAIR USE**: Any use of Plaintiff's alleged trademark(s) by Defendants are a use as other than a trademark in that, among other reasons, any use was fair and in good faith and/or to describe Defendants' business and goods and/or for its primary meaning.

102. **THIRTY-FIFTH AFFIRMATIVE DEFENSE**

**PLAINTIFFS' ALLEGED TRADEMARK IS FUNCTIONAL**: On information and belief, Plaintiff is not entitled to exclusive use in commerce of the alleged trademark(s) because the alleged trademark(s) are functional.

103. **THIRTY-SIXTH AFFIRMATIVE DEFENSE**

**RIGHT TO USE**: Any use by Defendants of any of Plaintiff's marks was done with authorization and/or with a right, contractual, ownership, and/or otherwise, to use the marks.

104. **THIRTY-SEVENTH AFFIRMATIVE DEFENSE**

**COMPULSORY CLAIMS**: The claims alleged by Plaintiff in the Complaint were compulsory claims that were required to be asserted in previous action(s), and therefore, Plaintiff has waived his right to assert and/or is barred from asserting the claims alleged.

105. **THIRTY-EIGHTH AFFIRMATIVE DEFENSE**

**NO LIKELIHOOD OF CONFUSION**: Any use by Defendants of any of Plaintiff's marks was not likely to cause confusion, mistake, or deception.

106. **THIRTY-NINTH AFFIRMATIVE DEFENSE**

**REGISTRATION FRAUDULENTLY OBTAINED**: Plaintiff obtained registration of the alleged marks fraudulently and/or any incontestable right to use the mark was fraudulently obtained by Plaintiff.

ANSWER TO COMPLAINT AND COUNTERCLAIM

107.   **FORTIETH AFFIRMATIVE DEFENSE**

**PRIOR USE:** Any use of Plaintiff's alleged marks was done without knowledge of Plaintiff's prior use.

108.   **FORTY-FIRST AFFIRMATIVE DEFENSE**

**NO INVENTION OR PATENT RIGHTS:** Plaintiff does not have any rights to the inventions and/or patents alleged in the Complaint and/or Defendants had the right to use and/or refer to the inventions and/or patents alleged.

109.   **FORTY-SECOND AFFIRMATIVE DEFENSE**

**FAILURE TO EXHAUST CONTRACTUAL REMEDIES:** To the extent that Plaintiff bases any part of the recovery sought on an agreement or contract, Plaintiff should be barred from recovery for failure to exhaust the remedies available under said agreement or contract.

110.   **FORTY-THIRD AFFIRMATIVE DEFENSE**

**FORFEITURE FROM INSUFFICIENT QUALITY CONTROL:** Plaintiff is barred from recovery due to a forfeiture of its rights when it failed to assure that, in the hands of the licensee(s), the mark continued to represent goods and/or services of the same pre-license quality.

111.   **FORTY-FOURTH AFFIRMATIVE DEFENSE**

**ADDITIONAL AFFIRMATIVE DEFENSES:** Defendants presently lacks sufficient knowledge or information upon which to ascertain whether as yet unstated affirmative defenses are available. Defendants reserve the right to assert additional defenses ascertained by further investigation and discovery.

////

////

////

////

13

ANSWER TO COMPLAINT AND COUNTERCLAIM

## PRAYER FOR RELIEF

Defendants pray for judgment as follows:

112. That Plaintiff take nothing by way of its Complaint;

113. That Defendants be awarded their costs of suit;

114. That Defendants be awarded their attorneys' fees as allowed by law; and

115. For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

116. Defendants hereby demand a trial by jury on all issues triable by a jury.

## COUNTERCLAIM

117. Counterclaimants CHRONIC TACOS HUNTINGTON BEACH, INC., Rob Sleenhof and Loes Sleenhof ("Counterclaimants"), by and through counsel, hereby complain against Counter Defendants CHRONIC TACOS ENTERPRISES, INC., Dan Bielo, Randall Wyner, and ROES 1 through 20 ("Counterdefendants") as follows:

## JURISDICTION, VENUE, AND PARTIES

118. At all times herein mentioned, Counterclaimant CHRONIC TACOS HUNTINGTON BEACH, INC. ("CTHB") was a California corporation, registered with the California Secretary of State, with its principal place of business in Orange County, state of California.

119. At all times herein mentioned, Counterclaimant CHRONIC TACOS CORONA DEL MAR, INC. ("CTCDM") was a California corporation, registered with the California Secretary of State, with its principal place of business in Orange County, state of California.

120. At all times herein mentioned, Counterclaimant ROB SLEENHOF was an individual residing in Orange County, state of California.

/ / / /

ANSWER TO COMPLAINT AND COUNTERCLAIM

121.   At all times herein mentioned, Counterclaimant LOES SLEENHOF was an individual residing in Orange County, state of California.

122.   Counterdefendants ROES 1-20 are presently unknown. Counterclaimant is informed and believes, and based thereon alleges, that ROES 1 through 20, inclusive, whether individual, corporate, associate or otherwise, engaged in the wrongful conduct alleged herein and are responsible in some manner for the occurrences alleged in this Counterclaim, and Counterclaimants therefore sue each of said Counterdefendants by fictitious names.

123.   Counterclaimants are informed and believe that the Counterclaim Defendants were partners, officers, agents, assignees, successors-in-interest, co-conspirators, principals, alter egos, or employees of each other or were otherwise responsible for, contributed to, or participated in the acts and omissions alleged herein, and thereby incurred liability therefore.

124.   Counterclaimants are informed and believe that the individual Counterdefendants, including Dan Bielo and Randall Wyner, and any corporate Counterdefendants, including CHRONIC TACOS ENTERPRISES, INC., commingled funds and other assets, diverted corporate funds between entities and individuals or for other than corporate purposes, treated corporate assets as personal assets, failed to observe corporate formalities, failed to maintain an arms-length relationship with the other corporation or the separate existence of the individual entities and individuals would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.  The acts alleged herein were committed and continue to be committed intentionally and at the direction of the individual Counterdefendants.

125.   This Court has jurisdiction over the subject matter of this Counterclaim pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

126.   Venue is proper pursuant to 28 U.S.C. § 1391.

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

## GENERAL ALLEGATIONS

127. On or about April 14, 2005, Counterclaimant CHRONIC TACOS HUNTINGTON BEACH, INC., was incorporated in the State of California.

128. In or about June, 2005, Counterdefendants CHRONIC TACOS ENTERPRISES, INC., Dan Bielo, and Randall Wyner entered into a written Shareholder Agreement with Counterclaimant Rob Sleenhof (a true and correct copy of said Shareholder Agreement is attached hereto as Exhibit "A").

129. The aforementioned Shareholder Agreement created a Board of Directors and distributed shares of Counterclaimant CHRONIC TACOS HUNTINGTON BEACH, INC., among Counterclaimant Rob Sleenhof and Counterdefendants Dan Bielo and Randall Wyner. Further, the terms of the written agreement provided that the company use the name "Chronic Tacos" with no restrictions or oversight. Counterdefendants Bielo and Wyner assured Counterclaimants that as shareholders they would continue to look out for the best interests of the company and the other shareholders and that the company could continue to use the "Chronic Tacos" name.

130. Prior to, contemporaneously with and subsequent to the Shareholder Agreement, Counterdefendants Dan Bielo and Randall Wyner repeatedly assured Counterclaimants that CTHB would always remain a "corporate store" and would not be part of any franchise.

131. On or about May 10, 2005, 125 shares of CTHB, representing a 12.5% interest, was transferred from Rob Sleenhof to Loes Sleenhof. Said transfer was done with the informed consent and approval of Counterdefendants CHRONIC TACOS ENTERPRISES, INC., Dan Bielo, and Randall Wyner.

132. In or about November, 2006, Counterclaimant CHRONIC TACOS CORONA DEL MAR, INC., was incorporated in the State of California. Counterclaimants Rob Sleenhof and Loes Sleenhof were each owners of a 25% interest in said company and Counterdefendant Randall Wyner held a 50%

ANSWER TO COMPLAINT AND COUNTERCLAIM

1  interest.

2      133.   Through the expenditure of substantial time, skill, labor and money,

3  Counterclaimants developed CTHB and CTCDM as successful restaurants which

4  consistently outperformed other "Chronic Tacos" locations.

5      134.   In order to attract other potential buyers of the "Chronic Tacos"

6  name/system, Counterdefendants would utilize the profit and loss data from CTHB

7  as it was the most profitable of the Chronic Tacos locations despite CTHB not

8  being representative of the other restaurants.  Counterdefendants desired to make

9  CTHB a franchise store in order to, *inter alia*, use CTHB sales data in order to

10  market the franchise to other investors.

11      135.   On or about July 28, 2009, Randall Wyner secretly transferred 6.25%

12  of CTHB to Tommy Chau for the sum of $60,000.00.  Counterclaimants were not

13  given any notice of the intent to transfer and purported transfer of shares or the

14  right of first refusal in violation of the Shareholder Agreement.

15      136.   On or about August 1, 2009, Randall Wyner secretly transferred

16  3.125% of CTHB to Tommy Chau for the sum of $30,000.00.  Counterclaimants

17  were not given any notice of the intent to transfer and purported transfer of shares

18  or the right of first refusal in violation of the Shareholder Agreement

19      137.   On or about October 22, 2009, Counterdefendants prepared a

20  document entitled Consent and Agreement to Buyout & Release and forged, or

21  otherwise improperly, fraudulently or illegally obtained, the signature of

22  Counterclaimant Rob Sleenhof thereon.  The document purported to show

23  Counterclaimant Rob Sleenhof's consent to and purchase of Counterdefendant

24  Dan Bielo's shares of CTHB for the sum of $480,000.00.  The document was

25  falsified and Counterclaimant Rob Sleenhof never in fact consented to any such

26  transfer or purchase of shares and no monies were paid by Sleenhof for that

27  purpose.

28  / / / /

17

ANSWER TO COMPLAINT AND COUNTERCLAIM

138. On or about November 20, 2009, Counterdefendant Randal Wyner secretly transferred a 3.125% interest in CTHB to both Louis Tinh Chau and Tommy Chau for the sum of $60,000.00.Counterclaimants were not given any notice of the intent to transfer and purported transfer of shares or the right of first refusal in violation of the Shareholder Agreement

139. On or about February 2, 2010, Counterdefendant Dan Bielo secretly transferred to Tommy Chau 382.5 shares of CTHB in exchange for Tommy Chau's transfer of 300 shares of Chronic Tacos Newport Beach. Counterclaimants were not given any notice of the intent to transfer and purported transfer of shares or the right of first refusal in violation of the Shareholder Agreement

140. Commencing on or about May, 2010, Counterdefendants repeatedly insisted that Counterclaimants sign a franchise agreement or stop using the "Chronic Tacos" name and related services and products. Counterdefendants claimed the continued use of the "Chronic Tacos" name was in violation of the Shareholder Agreement as the Counterdefendants were no longer shareholders in CTHB after transferring their shares away.

141. On or about August 18, 2010, after Counterdefendants' repeated demands that Counterclaimants join their franchise, Counterclaimants CTHB and CTCDM closed their respective bank accounts at Wells Fargo Bank in a effort to stop the weekly royalty deductions from their account by CTE. New accounts were opened at Wells Fargo and the monies were then transferred from the old accounts to the new ones.

142. On or about August 19, 2010, Counterdefendant Dan Bielo used false representations to convince a Wells Fargo employee to allow him to remove all of the funds (approximately $90,000.00) from the new bank accounts and cashier's checks were issued to Counterdefendant Dan Bielo. Counterclaimants Loes Sleenhof and Rob Sleenhoff learned of the withdrawal and contacted Wells Fargo with documentation to show the withdrawal was wrongful and unauthorized.

ANSWER TO COMPLAINT AND COUNTERCLAIM

Wells Fargo placed a stop payment on the cashier's checks and eventually convinced Counterdefendant Bielo to return the funds to the bank later the same day, after the bank had closed for business.  This resulted in bounced checks to Counterclaimants' vendors which had been presented to Wells Fargo that day for payment.

## FIRST CAUSE OF ACTION

Fraudulent Inducement

(By Counterclaimants Rob Sleenhof and Loes Sleenhof against

Counterdefendants CHRONIC TACOS ENTERPRISES, INC.,

Dan Bielo, Randall Wyner and ROES 1-20)

143.   Counterclaimants repeat, reallege and incorporate by reference each of the preceding Paragraphs, as though fully set forth and plead herein.

144.   Counterdefendants made the following false representations to Counterclaimants Rob Sleenhof and Loes Sleenhof:

     i.    that CTHB would always remain a "corporate store" and would not be part of any franchise; and

     ii.    that Counterdefendants would not transfer any shares of CTHB without first providing notice to other shareholders and allow Counterclaimants the right of first refusal.

145.   Counterdefendants were aware that their representations were false.

146.   Counterdefendants made said false representations with the intent that Counterclaimants would rely thereon to their detriment by entering into the Shareholder Agreement.

147.   Counterclaimants believed the foregoing representations to be truthful.

148.   Counterclaimants were reasonable in believing the representations to be truthful.

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

149.   Counterclaimants detrimentally relied on the representations by entering into the Shareholder Agreement.

150.   It was foreseeable to Counterdefendants that Counterclaimants would believe and rely on the representations to their detriment.

151.   As a direct and proximate cause of Counterdefendants' fraudulent conduct, Counterclaimants have suffered damages in an amount to be proven at trial.

152.   In committing the acts and omissions alleged herein, Counterdefendants acted with malice, fraud and oppression for which punitive damages are proper to discourage similar conduct in the future.

## SECOND CAUSE OF ACTION

Breach of Contract

(By Counterclaimant Rob Sleenhof against Counterdefendants Dan Bielo and Randall Wyner and ROES 1-20)

153.   Counterclaimants repeat, reallege and incorporate by reference each of the preceding Paragraphs, as though fully set forth and plead herein.

154.   In or about June, 2005, Counterdefendants Dan Bielo, and Randall Wyner entered into a written agreement for valuable consideration with Counterclaimant Rob Sleenhof (a true and correct copy of said Shareholder Agreement is attached hereto as Exhibit "A").

155.   Article V ("Transfer of Shares") required that Counterdefendants not transfer any shares without first providing notice to all other shareholders of an intent to transfer the shares, obtaining consent from the other shareholders and allowing the other shareholders the right of first refusal to purchase any such shares.

156.   Counterclaimant performed all of his duties under the Shareholder Agreement.

/ / / /

20

ANSWER TO COMPLAINT AND COUNTERCLAIM

157.   On or about July 28, 2009, Randall Wyner breached the Shareholder Agreement by secretly transferring 6.25% of CTHB to Tommy Chau for the sum of $60,000.00.

158.   On or about August 1, 2009, Randall Wyner breached the Shareholder Agreement by secretly transferring 3.125% of CTHB to Tommy Chau for the sum of $30,000.00.

159.   On or about October 22, 2009, Counterdefendants prepared a document entitled Consent and Agreement to Buyout & Release and forged the signature of Counterclaimant Rob Sleenhof thereon.  The document purported to show Counterclaimant Rob Sleenhof's consent to and purchase of Counterdefendant Dan Bielo's shares of CTHB for the sum of $480,000.00.  The document was falsified and Counterclaimant Rob Sleenhof never in fact consented to any such transfer or purchase of shares and no monies were paid by Sleenhof for that purpose.

160.   On or about November 20, 2009, Counterdefendant Randal Wyner breached the Shareholder Agreement by secretly transferring a 3.125% interest in CTHB to both Louis Tinh Chau and Tommy Chau for the sum of $60,000.00.

161.   On or about February 2, 2010, Counterdefendant Dan Bielo breached the Shareholder Agreement by secretly transferring to Tommy Chau 382.5 shares of CTHB in exchange for Tommy Chau's transfer of 300 shares of Chronic Tacos Newport Beach.

162.   As a direct and proximate cause of Counterdefendant Bielo's wrongful acts, Counterclaimant has suffered damages in an amount to be proven at trial, including but not limited to the lost value of the right of first refusal, the loss of the license rights set forth in Section 7.3 of the Shareholder Agreement, and loss of profits due to disruption to his business operations.

////

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

## THIRD CAUSE OF ACTION

Conversion

(By Counterclaimants Rob Sleenhof, Loes Sleenhof, CHRONIC TACOS
HUNTINGTON BEACH, INC., CHRONIC TACOS CORONA DEL MAR,
INC., against Counterdefendant Dan Bielo, and ROES 1-20)

163.   Counterclaimants repeat, reallege and incorporate by reference each of the preceding Paragraphs, as though fully set forth and plead herein.

164.   Counterclaimants Rob Sleenhof, Loes Sleenhof, CHRONIC TACOS HUNTINGTON BEACH, INC., and CHRONIC TACOS CORONA DEL MAR, INC., were the lawful owners and entitled to possession of a specific, identifiable sum of money (approximately $90,000.00) which was deposited in their accounts with Wells Fargo Bank.

165.   Counterdefendant Dan Bielo had no interest in said funds and did not have any rights to withdraw the funds from Wells Fargo Bank.

166.   Counterdefendant Dan Bielo wrongfully converted said funds to his own use by falsely representing he had a right to withdraw them and the subsequent withdrawal of the same.

167.   Counterclaimants demanded the immediate return of said monies to them but Counterdefendant Bielo refused.

168.   While the monies were eventually returned to Wells Fargo Bank, as a direct and proximate cause of Counterdefendant Beilo's wrongful acts, Countercomplainants have suffered damages in an amount to be proven at Trial, including but not limited to bouncing checks to their vendors and suppliers due to insufficient funds and resulting fees from Wells Fargo associated with the insufficient funds, damages to the previously healthy business relationship Countercomplainants and their vendors/suppliers, and loss of profits from the disruption to their business operations.

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

169.   In committing the acts and omissions alleged herein, Counterdefendant Bielo acted with malice, fraud and opression.  Punitive damages are proper to discourage similar conduct in the future.

### FOURTH CAUSE OF ACTION

Declaratory Relief and Permanent Injunction

(By Counterclaimants Rob Sleenhof, Loes Sleenhof and CHRONIC TACOS HUNTINGTON BEACH, INC., against Counterdefendants Dan Bielo, Randall Wyner, CHRONIC TACOS ENTERPRISES, INC., and ROES 1-20)

170.   Counterclaimants repeat, reallege and incorporate by reference each of the preceding Paragraphs, as though fully set forth and plead herein.

171.   Counterdefendants secretly and fraudulently transferred shares in violation of the Shareholder Agreement.

172.   Based on said unlawful transfers, Counterdefendants allege that Counterclaimants no longer have any right to use the name "Chronic Tacos" and its related products and services.

173.   The share transfers are unenforceable as being done in violation of the Shareholder Agreement.

174.   In the event the Court deems the Shareholder Agreement enforceable, Counterclaimants should still have all of the rights set forth in Section 7.3 of the Shareholder Agreement, as well as all other rights therein and the share transfers deemed unenforceable and unlawful.  Furthermore, as the rights provided in Section 7.3 were without restriction or oversight, and Counterclaimants were permitted to, and did, continuously use the "Chronic Tacos" name, it should be held that Counterclaimants have an absolute right to continue to use the "Chronic Tacos" name.

////

////

////

ANSWER TO COMPLAINT AND COUNTERCLAIM

## FIFTH CAUSE OF ACTION

### Unfair Competition

(By Counterclaimants Rob Sleenhof, Loes Sleenhof and CHRONIC TACOS HUNTINGTON BEACH, INC., against Counterdefendants Dan Bielo, Randall Wyner, CHRONIC TACOS ENTERPRISES, INC., and ROES 1-20)

175. Counterclaimant alleges each and every preceding paragraph as though set forth fully herein.

176. The acts of Counterdefendants constitute unfair competition. Counterdefendants have, and are, intentionally causing confusion or deception with respect to Counterclaimants' products and falsely claiming that Counterclaimants are infringing their trademarks.

177. Counterclaimant has been damaged in an amount to be proven at trial as a result of Counterdefendants' acts.

178. The conduct of Counterclaim Defendants was intentional, wilful, malicious, and without foundation in law, and therefore, Counterclaim is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants pray for judgment as follows:

179. FIRST CAUSE OF ACTION - Fraudulent Inducement:

    i.    For damages;

    ii.    For recision and restitution;

    iii.    For punitive damages in an amount necessary to punish Counterdefendants and discourage future wrongful conduct;

    iv.    For attorneys fees as allowed by law;

    v.    For interest as allowed by law;

    vi.    For such other and further relief as the Court may deem proper.

////

////

180. SECOND CAUSE OF ACTION - Breach of Contract:

    i.    For damages;

    ii.    For costs of suit herein incurred;

    iii.    For attorneys fees as allowed by law;

    iv.    For interest as allowed by law;

    v.    For such other and further relief as the Court may deem proper.

181. THIRD CAUSE OF ACTION - Conversion:

    i.    For damages;

    ii.    For punitive damages in an amount necessary to punish Counterdefendants and discourage future wrongful conduct;

    iii.    For costs of suit herein incurred;

    iv.    For attorneys fees as allowed by law;

    v.    For interest as allowed by law;

    vi.    For such other and further relief as the Court may deem proper.

182. FOURTH CAUSE OF ACTION - Declaratory Relief:

    i.    That it be adjudged and determined that the transfer of shares by Counterdefendants was unlawful and unenforceable;

    ii.    That is be adjudged and determined that Counterclaimants have the lawful right to utilize the "Chronic Tacos" name and associated products/services;

    iii.    For costs of suit herein incurred;

    iv.    For attorneys fees as allowed by law;

    v.    For interest as allowed by law;

    vi.    For such other and further relief as the Court may deem proper.

/ / / /

/ / / /

/ / / /

/ / / /

ANSWER TO COMPLAINT AND COUNTERCLAIM

183. **FIFTH CAUSE OF ACTION - Unfair Competition:**

    i.    For damages;

    ii.    For costs of suit herein incurred;

    iii.    For attorneys fees as allowed by law;

    iv.    For interest as allowed by law;

    v.    For punitive damages in an amount necessary to punish Counterdefendants and discourage future wrongful conduct;

    vi.    For such other and further relief as the Court may deem proper.


Respectfully Submitted,

DEHNADI & CONLEY, LLP


DATE: _____11/12/10_____

Ted D. Conley, Esq., Attorneys of Record
for Defendants and Counterclaimants
CHRONIC TACOS HUNTINGTON
BEACH, INC., CHRONIC TACOS
CORONA DEL MAR, INC., ROB
SLEENHOF and LOES SLEENHOF

ANSWER TO COMPLAINT AND COUNTERCLAIM

# EXHIBIT "A"

# SHAREHOLDER AGREEMENT

THIS SHAREHOLDER AGREEMENT ("Agreement") is entered into this ___ day of June, 2005, in Orange County, California, by and between ROB SLEENHOF ("SLEENHOF"), RANDALL WYNER ("WYNER") and DAN BIELO ("BIELO"), hereinafter jointly referred to as the "Shareholders".

WHEREAS, the parties have formed a corporation for the purpose of operating a restaurant;

NOW, THEREFORE, in consideration of the promises contained herein, we mutually agree as follows:

## ARTICLE I
## DEFINITIONS

The terms specified in this article have the following meanings in this Agreement.

1.1     Board of Directors. The Board of Directors shall consist of all of the Directors of the Company duly elected by the Shareholders. No action of any Director acting independently of the other Directors shall be binding. All references to approval of Directors shall mean the approval of the Board of Directors acting as a body in conformity to the terms of this Agreement and the Company's By-laws.

1.2     Shares. Shares shall consist of all the Common Shares that have been both authorized and issued. The Shares will have all of the traditional voting rights commonly associated with common shares along with any supplemental voting rights granted herein.

1.3     Company. The Company shall be CHRONIC TACOS HUNTINGTON BEACH, INC. a California Corporation filed with the Secretary of State on April 14, 2005.

1.4     Officer. Officer shall be an individual appointed to a position of authority by the Directors, and each officer shall have the powers and duties usually associated with that office.

1.5     Super-majority. Unless otherwise specified herein, Super-Majority shall mean two-thirds of the Shares.

## ARTICLE II
## STOCK

2.1     Common Shares. The Company has authorized one million (1,000,000) shares of Stock to be issued with no par value. The Shares have all of the traditional voting rights commonly associated with shares except as specified herein, in the Articles of Incorporation, and the By-laws. The Shareholders and their respective share ownership as of the date of this agreement are:

|  |  |
|---|---|
| ROB SLEENHOFF | 490 shares |
| RANDALL WYNER | 255 shares |
| DAN BIELO | 255 shares |

A.     Apart from the restaurant build-out costs (see paragraph 7.1 below),

when the Company requires additional capital, as determined by the Directors, to purchase real estate or to advance the purpose of the Company, each shareholder shall each equally purchase additional common stock as needed to provide the additional capital as determined by the Directors. The number of shares to be purchased by each shareholder, as well as the price of each share and the time of purchase, shall be determined by the Board of Directors.

      B.    The Company may further issue additional shares of the authorized Common Stock at the price the Board of Directors shall determine at the time the Common Shares are issued, subject to the provisions of Section 3.3 herein.

      2.2    <u>Failure to Make Contributions</u>. If a shareholder does not timely contribute capital when required, that shareholder shall be in default under this Agreement. In such event, the Company shall send the defaulting Shareholder written notice of such default, giving him or her fourteen (14) days from the date such notice is given to contribute the entire amount of his or her required capital contribution. If the defaulting Shareholder does not contribute his or her required capital to the Company within said fourteen (14)-day period, all of the non-defaulting Shareholders may elect any one or more of the following remedies:

      A.    The non-defaulting Shareholders may advance funds to the Company to cover those amounts that the defaulting Shareholder fails to contribute. Amounts which a non-defaulting Shareholder so advances on behalf of the defaulting Shareholder shall become a loan due and owing from the defaulting Shareholder to such non-defaulting Shareholder and bear interest at the rate of ten percent (10%) per annum, payable monthly. All cash distributions otherwise distributable to the defaulting Shareholder under this Agreement shall instead be paid to the non-defaulting Shareholders making such advances until such advances and Stock thereon are paid in full. In any event, any such advances shall be evidenced by a promissory note in a form reasonably acceptable to the Shareholders and be due and payable by the defaulting Shareholder one (1) year from the date that such advance was made. Any amounts repaid shall first be applied to interest and thereafter to principal. Effective upon a Shareholder becoming a defaulting Shareholder, each Shareholder grants to the non-defaulting Shareholders who advance funds under this Section 3.2 a security interest in his or her shares of the Company to secure his or her obligation to repay such advances and agrees to execute and deliver a promissory note as described herein together with a security agreement in a form reasonably acceptable to the Shareholders and such UCC-1 financing statements and assignments of certificates of stock (or other documents of transfer) as such non-defaulting Shareholders may reasonably request.

      B.    The Board of Directors may authorize the Company to issue additional common shares of Company stock to be purchased by the non-defaulting Shareholders.

      C.    The non-defaulting Shareholders who hold a majority of the shares held by all non-defaulting Shareholders may dissolve the Company, in which event the Company shall be wound-up, liquidated and terminated pursuant to this agreement, the Bylaws of the Company and the laws of the State of California.

      D.    The Company or the non-defaulting Shareholders may purchase all of the defaulting Shareholder's shares of the Company stock which price shall be an amount equal to the purchase price determined in accordance with Article V.

      E.    The defaulting Shareholders shall have no right to receive any distributions from the Company until the non-defaulting Shareholders have first received distributions in an amount equal to the additional capital contributed by each non-defaulting Shareholder to the

Company plus a cumulative, non-compounded return thereon at the rate of ten percent (10%) per annum.

F.    Each Shareholder acknowledges and agrees that (i) a default by any Shareholder in making a required capital contribution will result in the Company and the non-defaulting Shareholders incurring certain costs and other damages in an amount that would be extremely difficult or impractical to ascertain and (ii) the remedies described in this Section bear a reasonable relationship to the damages which the Shareholders estimate may be suffered by the Company and the non-defaulting Shareholders by reason of the failure of a defaulting Shareholder to make any required Capital Contribution and the election of any or all of the above described remedies is not unreasonable under the circumstances existing as of the date hereof.

G.    The election of the non-defaulting Shareholders, as applicable, to pursue any remedy provided in this Section shall not be a waiver or limitation of the right to pursue an additional or different remedy available hereunder or of law or equity with respect to any subsequent default.

## ARTICLE III
## CAPITALIZATION

3.1    Subscription.    Each Shareholder has contributed the capital specified below.

| Name | No. Shares | Consideration |
|------|-----------|---------------|
| ROB SLEENHOFF | 490 shares | $490 |
| RANDALL WYNER | 255 shares | $255 |
| DAN BIELO | 255 shares | $255 |

3.2    Exemption.    The Shares of the Company have been issued pursuant to the exemption provided in Section 25102(f) of the California Corporations Securities Act of 1968. Each of the Shareholders represent that they are all founders of the Company and will serve as officers and directors of the Company, each has a preexisting personal or business relationship with the other shareholders, each is purchasing the shares for their own account for investment and not for resell, and the offer or sale of the shares was not accomplished by the publication of any advertisement.

3.3    Restricted Market.    The Company is a privately held corporation, and no market for its Shares is readily available. This Agreement places restrictions on the transfer of Shares by a Shareholder. All stock certificates shall conspicuously note that the shares are subject to the provisions of this Agreement.

3.4    Section 1244 Stock.    The parties acknowledge that they have been advised of the benefits of treating their Shares in the Company as stock held pursuant to Internal Revenue Code Section 1244. The parties acknowledge that the Shareholder, and not the Company, decides whether to treat the Shares as Section 1244 Stock.

## ARTICLE IV
## MANAGEMENT AND CONTROL

4.1    Board of Directors.    Subject to the terms of this Agreement, the business of the Company shall be managed under the direction of its Board of Directors. It is understood that,

even though the Company qualifies as a close corporation, as defined in Section 186 of the Code, the Shareholders and the Company elects not to allow the business affairs to be managed directly by the shareholders except as otherwise specified herein. Nothing herein shall imply that this Agreement attempts to alter the statutory definition of a close corporation or any statutory rights resulting therefrom.

       A.     The Board of Directors shall consist of at least three (3) Directors. The Directors shall be elected by the Common Shareholders by cumulative voting.

       B.     The three (3) Common Shareholders hereby agree that, as long as they own Common Shares in the company, they shall pool their votes for Directors, whereby each Shareholder shall vote one-third (1/3) of his Common Shares for each of the Shareholders, or for the person each Shareholder nominates, if the Shareholder chooses not to be a Director.

       C.     The Directors shall serve without compensation for their services as a Director, but may receive compensation for other services provided to the Company.

       D.     The Shareholders agree that any corporate action require that at least two of the three directors agree and authorize the action. Expenditures shall be limited and no director may authorize any expenditure over Two Thousand Dollars ($2000.00) without the consent of the shareholders or the other directors. All salaries must be approved by the directors and offers of employment must be approved in advance.

4.2     Officers. The Directors may appoint various Officers to manage the day-to-day operations of the business of the Company as the Directors deem appropriate. Officers shall work under the direction of the Directors. Each officer shall have the general powers and duties that usually are associated with that office.

       A.     The Directors agree to elect, the persons specified below to the respective office. These persons shall continue to hold these offices until they resign or are replaced by the Directors.

| | |
|---|---|
| President, Chief Executive Officer (CEO) | ROB SLEENHOF |
| Chief Financial Officer (CFO) | LOES SLEENHOF |
| Secretary | TODD ENGLES |
| Vice President of Operations | DANIEL BIELO |
| Vice President of Marketing | RANDALL WYNER |

       B.     Officers may be compensated for their services to the Company as the Directors shall from time to time decide. Any change in compensation shall require a Super-Majority vote of the Directors.

4.3     Special Voting Provisions. A super majority vote of at least two thirds (2/3) vote of all of the Common Shares is required to undertake any of the following actions: (i) Sell, transfer, assign, hypothecate, or encumber all or substantially all of the Company's assets over a twelve month period of time, whether it occurs as a single or a series of transactions; (ii) Issue stock in exchange for any consideration not specified in this Agreement; (iii) Merge the Company with any other business entity; or (iv) Any act which would prevent the Company from conducting its authorized business.

4.4    Compensation. When Company's receipts do not exceed its operating and business expenses for a given month, any amounts the Company transfers to any shareholder under the guise of compensation for services shall be deemed as a personal loan from the Company to that shareholder, bearing no Stock. Conversely, any unpaid compensation that a shareholder would have received for his services except for the fact that the Company's receipts do not exceed its operating and business expenses for the given month, shall be deemed a loan from the Shareholder to the Company, bearing no Stock. Subsequently, as soon as the Company's receipts exceed its operating and business expenses for any given month, and after these operating and business expenses are satisfied, any draws taken by shareholders, that were deemed personal loans from the Company, which were taken under the guise of compensation for hours actually worked by the shareholder, shall be deemed vested compensation for that shareholder, and the corresponding personal loan from the Company shall be satisfied, and any unpaid compensation to shareholders shall be paid to the fullest extent possible with the corresponding loan to the Company being satisfied. However, the vesting of said compensation shall only take place after compensation for services that shareholders provided to the Company in that specific month have been fully paid first.

4.5    Dividends. The Company may pay dividends as the Directors from time to time decide, as long as the dividends comply with statutory requirements, which in general require dividends to be paid out of accumulated earnings and profit or from assets as long as they exceed liabilities by one hundred twenty-five percent (125%) and the company is able to meet its obligations. The dividends shall be distributed on the weighted average of voting shares held during the year, or since the last dividend, whichever time period is shorter. It is agreed that the Directors shall use their best efforts to distribute, as dividends, profit earned on a quarterly basis. Such distribution shall be made within 60 days of the end of each quarter.

4.6    Indemnification. The Company agrees to indemnify, to the fullest extent permitted by law, all of its Officers and Directors for any claims, judgments, fines, or expenses of any kind that is incurred as a result of the Officer or Director's performance as an agent of the Company, as long the Officer or Director's actions were not illegal or grossly negligent.

## ARTICLE V
## TRANSFER OF SHARES

5.1    Transfer and Assignment of Stock. No Shareholder shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Stock (collectively, "transfer") except with the prior written consent of all Shareholders, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as all Shareholders may determine in their sole discretion. Transfers in violation of this Article shall only be effective to the extent set forth in Section 5.7. After the consummation of any transfer of any part of a Shareholder's Stock, the new Shareholder shall execute a copy of this Agreement, as amended, and the Stock so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

5.2    Further Restrictions on Transfer of Stocks. In addition to other restrictions found in this Agreement, no Shareholder shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Stock without compliance with all federal and state securities laws.

5.3     Substitution of Shareholders. An Assignee of a Shareholder's Stock shall have the right to become a substitute Shareholder only if (i) the requirements of Sections 5.1 and 5.2 relating to unanimous consent of Shareholders, securities and tax requirements hereof are met, (ii) the Assignee executes an instrument satisfactory to the Shareholders accepting and adopting the terms and provisions of this Agreement, and (iii) the Assignee pays any reasonable expenses in connection with his or her admission as a new Shareholder. The admission of an Assignee as a substitute Shareholder shall not result in the release of the Shareholder who assigned the Stock from any liability that such Shareholder may have to the Company.

5.4     Permitted Transfers. The Stock of any Shareholder may be transferred to any other Shareholder, subject to compliance with Section 5.2, and without the prior written consent of the Shareholders. The Economic interest of any Shareholder may be transferred subject to compliance with Section 5.2, and without the prior written consent of the Shareholders as required by Section 5.1 to a trust for the benefit of the Shareholder or such spouse, parent, sibling, in-law, child or grandchild of the Shareholder.

5.5     Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Shareholder's Stock or an Economic interest shall be effective no sooner than the date as of which the requirements of Sections 5.1, 5.2 and 5.3 have been met. The Shareholders shall provide the Shareholders with written notice of such transfer, and the effective date thereof, as promptly as possible after the requirements of Sections 5.1, 5.2 and 5.3 have been met. Any transferee of a Shareholder's Stock shall take subject to the restrictions on transfer imposed by law and this Agreement.

5.6     Rights of Legal Representatives. If a Shareholder who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Shareholder's person or property, the Shareholder's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Shareholder's rights for the purpose of settling the Shareholder's estate or administering the Shareholder's property, including any power the Shareholder has under the Articles or this Agreement to give an assignee the right to become a Shareholder. If a Shareholder is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Shareholder may be exercised by his or her legal representative or successor.

5.7     No Effect to Transfers in Violation of Agreement. Upon any transfer of a Shareholder's Stock in violation of this Article V, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Shareholder. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Stock would otherwise be entitled.

Upon and contemporaneously with any transfer (whether arising out of an attempted charge upon that Shareholder's Economic Stock by judicial process, a foreclosure by a creditor of the Shareholder or otherwise) of a Shareholder's Economic interest (other than in accordance with Section 5.4) which does not at the same time transfer the balance of the rights associated with the Stock transferred by the Shareholder (including, without limitation, the rights of the Shareholder to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Shareholder, and the Shareholder shall sell to Company for a purchase price of $100, all remaining rights and Stocks retained by the Shareholder that immediately before the transfer were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Shareholder from any liability to the Company as a Shareholder.

Each Shareholder acknowledges and agrees that the right of the Company to purchase such remaining rights and Stocks from a Shareholder who transfers Stock in violation of this Article V is not unreasonable under the circumstances existing as of the date hereof.

5.8     Right of First Negotiation. If any Shareholder desires to transfer all or any part of his or her Stock other than pursuant to Section 5.4, such Shareholder shall notify the Company and the other Shareholders in writing of such desire and, for a period of thirty (30) days thereafter, the Shareholders and the Company shall negotiate with respect to the purchase of such Shareholder's Stock. During such period, the Shareholder desiring to transfer such Stock may not solicit a transferee for such Stock.

5.9     Right of First Refusal. If the period described in Section 5.8 expires without an agreement being reached as to the purchase of the Stock referred to therein, the Shareholder desiring to transfer his or her Stock may solicit transferees. In such event, each time a Shareholder proposes to transfer all or any part of his or her Stock (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 6.4, such Shareholder shall first offer such Stock to the Company and the non-transferring Shareholders in accordance with the following provisions:

A.     Such Shareholder shall deliver a written notice ("Option Notice") to the Company and the other Shareholders stating (i) such Shareholder's bona fide intention to transfer such Stock, (ii) the Stock to be transferred, (iii) the purchase price and terms of payment for which the Shareholder proposes to transfer such Stock and (iv) the name and address of the proposed transferee.

B.     Within thirty (30) days after receipt of the Option Notice, the Company shall have the right, but not the obligation, to elect to purchase all or any part of the Stock upon the price and terms of payment designated in the Option Notice. If the Option Notice provides for the payment of non-cash consideration, the Company may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Shareholders. If the Company exercises such right within such thirty (30) day period, the Shareholders shall give written notice of that fact to the transferring and non-transferring Shareholders.

C.     If the Company fails to elect to purchase the entire Stock proposed to be transferred within the thirty (30) day period described in Section 5.9B, the non-transferring Shareholders shall have the right, but not the obligation, to elect to purchase any remaining share of such Stock upon the price and terms of payment designated in the Option Notice. If the Option Notice provides for the payment of non-cash consideration, such purchasing Shareholders each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Shareholders. Within sixty (60) days after receipt of the Option Notice, each non-transferring Shareholder shall notify the Shareholders in writing of his or her desire to purchase a portion of the Stock proposed to be so transferred. The failure of any Shareholder to submit a notice within the applicable period shall constitute an election on the part of that Shareholder not to purchase any of the Stock which may be so transferred. Each Shareholder so electing to purchase shall be entitled to purchase a portion of such Stock in the same proportion that the Percentage Stock of such Shareholder bears to the aggregate of the Percentage Stocks of all of the Shareholders electing to so purchase the Stock being transferred. In the event any Shareholder elects to purchase none or less than all of his or her

pro rata share of such Stock, then the other Shareholders can elect to purchase more than their pro rata share.

D.     If the Company and the other Shareholders elect to purchase or obtain any or all of the Stock designated in the Option Notice, then the closing of such purchase shall occur within ninety (90) days after receipt of such notice and the transferring Shareholder, the Company and/or the other Shareholders shall execute such documents and instruments and make such deliveries as may be reasonably required to consummate such purchase.

E.     If the Company and the other Shareholders elect not to purchase or obtain, or default in their obligation to purchase or obtain, all of the Stock designated in the Option Notice, then the transferring Shareholder may transfer the portion of the Stock described in the Option Notice not so purchased, to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Shareholders' right to purchase such Stock, (ii) is made on terms no less favorable to the transferring Shareholder than as designated in the Option Notice, and (iii) complies with Sections 5.1, 5.2 and 5.3 relating to unanimous consent of Shareholders, securities and tax requirements; it being acknowledged by the Shareholders that compliance with Sections 5.8 and 5.9A-D does not modify any of the transfer restrictions in Article VII or otherwise entitle a Shareholder to transfer his or her Stock other than in the manner prescribed by Article VII. If such Stock is not so transferred, the transferring Shareholder must give notice in accordance with this Section prior to any other or subsequent transfer of such Stock.

5.10     Transfers and Assignments of Shareholders' Stocks.  Notwithstanding Section 5.9, upon the transfer of the Stock of a Shareholder, the remaining Shareholders shall have the first right, pro-rata as to their Stocks as Shareholders, to elect to exercise the right of first refusal set forth in Section 5.9 for a period of ten (10) days after receipt of the Option Notice described in Section 5.9A. Such exercise shall be made in writing to the Company. If any Shareholder fails to exercise his or her rights under this Section 5.10, the other remaining Shareholders may elect to purchase the balance pro rata. If the remaining Shareholders elect to purchase less than all of the transferor's Stock, the portion of such Stock not elected to be purchased shall be subject to purchase and sale in accordance with Section 5.9.

5.11     Option to Purchase a Shareholder's Stock.  Each Shareholder hereby irrevocably grants to the Company the right to purchase the Shareholder's Stock in the Company, upon a 2/3 vote of the other Shareholders and subject to the same terms and price specified in Section Eight herein as if it were a dissolving event.

5.12     Divorce or Dissolution of a Married Shareholder.  Notwithstanding any other provisions of this Agreement:

If, in connection with the divorce or dissolution of the marriage of a Shareholder, any court issues a decree or order that transfers, confirms, or awards Units, or any portion thereof, to that Shareholder's spouse (an Award), then, notwithstanding that such transfer would constitute an un-permitted transfer under this Agreement, that Shareholder shall have the right to purchase from his or her former spouse the Units, or portion thereof, that was so transferred, and such former spouse shall sell the Units or portion thereof to that Shareholder at the price set forth herein. If the Shareholder has failed to consummate the purchase within 180 days after the Award (the Expiration Date), the Company and the other Shareholders shall have the option to purchase from the former spouse the Units or portion thereof; provided that the option period

shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

If, by reason of the death of a spouse of a Shareholder, any portion of the Units is transferred to a Transferee other than (1) that Shareholder or (2) a trust created for the benefit of that Shareholder (or for the benefit of that Shareholder and any combination between or among the Shareholder and the Shareholder's issue) in which the Shareholder is the sole Trustee and the Shareholder, as Trustee or individually possesses all of the voting Stock included in such Units, then the Shareholder shall have the right to purchase the Units or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall sell the Units or portion thereof at the price set forth herein. If the Shareholder has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Shareholders shall have the option to purchase from the estate or other successor of the deceased spouse the Units or portion thereof; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

5.13     Purchase Price. The purchase price for the Former Shareholder's Stock shall be the fair market value of the Stock as determined by the Company; provided, however, that if the Former Shareholder or such Former Shareholder's legal representative deems the value set by the Company to vary from the fair market value of the Former Shareholder's Stock by more than ten percent (10%), such party shall be entitled to require an appraisal by providing notice of the request for appraisal within thirty (30) days after the determination of value by the Company. In such event, the value of the Former Shareholder's Stock shall be determined by three (3) independent appraisers, one (1) selected by the Former Shareholder or such Former Shareholder's legal representative, one selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Shareholder's Stock shall be the average of the two (2) appraisals closest in amount to each other. In the event the fair market value is determined to vary from the value set by the Company by less than ten percent (10%), the party requesting such appraisal shall pay all expenses of all the appraisals. In all other events, the party requesting the appraisal shall pay one-half of such expense and the other party shall pay one-half of such expense. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Shareholder, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Shareholders as a result of such breach.

5.14     Notice of Intent to Purchase. Within thirty (30) days after the Shareholders have notified the Remaining Shareholders as to the purchase price of the Former Shareholder's Stock determined in accordance with Section 5.13, each Remaining Shareholder shall notify the Shareholders in writing of his or her desire to purchase a portion of the Former Shareholder's Stock. The failure of any Remaining Shareholder to submit a notice within the applicable period shall constitute an election on the part of the Shareholder not to purchase any of the Former Shareholder's Stock. Each Remaining Shareholder so electing to purchase shall be entitled to purchase a portion of the Former Shareholder's Stock in the same proportion that the Percentage Stock of the Remaining Shareholder bears to the aggregate of the Percentage Stocks of all of the Remaining Shareholders electing to purchase the Former Shareholder's Stock.

5.15     Election to Purchase Less Than All of the Former Shareholder's Stock. If any Remaining Shareholder elects to purchase none or less than all of his or her pro rata share of the Former Shareholder's Stock, then the Remaining Shareholders may elect to purchase more than their pro rata share. If the Remaining Shareholders fail to purchase the entire Stock of the Former Shareholder, the Company may purchase any remaining share of the Former Shareholder's Stock.

5.16    Payment of Purchase Price.  The purchase price shall be paid by the Company or the Remaining Shareholders, as the case may be, by either of the following methods, each of which may be selected separately by the Company or the Remaining Shareholders:

A.      The Company or the Remaining Shareholders shall at the closing pay in cash the total purchase price for the Former Shareholder's Stock; or

B.      The Company or the Remaining Shareholders shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at the rate of ten percent (10%) annual simple interest from the month in which the initial payment is made, but the Company and the Remaining Shareholders shall have the right to prepay in full or in part at any time without penalty.  The obligation of each purchasing Remaining Shareholder, and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Remaining Shareholder or the Company, as applicable.  Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Shareholder or the Company, as applicable.  The promissory note executed by each purchasing Remaining Shareholder shall be secured by a pledge of that portion of the Former Shareholder's Stock purchased by such Remaining Shareholder.

5.17    Closing of Purchase of Former Shareholder's Stock.  The closing for the sale of a Former Shareholder's Stock pursuant to this Article VI shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the Former Shareholder or such Former Shareholder's legal representative shall deliver to the Company or the Remaining Shareholders an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Shareholder's Stock.  The Former Shareholder or such Former Shareholder's legal representative, the Company and the Remaining Shareholders shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

5.18    Purchase Terms Varied by Agreement.  Nothing contained herein is intended to prohibit Shareholders from agreeing upon other terms and conditions for the purchase by the Company or any Shareholder of the Stock of any Shareholder in the Company desiring to retire, withdraw or resign, or sell his Stock in whole or in part.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In addition to the representations and warranties that are specified elsewhere in this Agreement, the parties represent and warrant the following:

6.1     Power to Contract.  The parties have the full right and authority to enter into and fully perform their obligations under this Agreement, and are not prevented by any agreement or law from entering or fully performing its obligations under this Agreement.  No permission, approval or consent by any third party or governmental authority, or any individual or entity connected with any party is required in order to consummate the transactions contemplated by this Agreement.

6.2     Free Transferability.   All assets to be transferred to the Company pursuant to this Agreement are freely transferable to the Company, and consist of all rights, title, and Stock in the Assets, and no other party has any Stock in the Assets.

6.3     No Breach of Prior Agreements.   The consummation of the transactions contemplated by this Agreement will not result in or constitute a breach of any term or provision of any other agreement, or any lease, license, note, sales contract, commitment, indenture, mortgage, deed of trust, or any other instrument or arrangement to which Seller is a party or by which the property may be bound, and Seller is not a partner in any partnership.

6.4     No Misrepresentation.   None of the representations of Seller in this Agreement, including but not limited to the forgoing representations and warranties, contains any untrue statement of material fact, or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

6.5     Additional Documents.   Each party to this Agreement represents, warrants, and promises that he or she will execute any document that Buyer reasonable believes necessary to accomplish the objectives of this Agreement.

ARTICLE VII
ADDITIONAL CONSIDERATIONS

7.1     Restaurant Build Out.   The Shareholders agree that the initial cost of the Build-out of the restaurant shall be paid by Sleenhof. The anticipated amount of the improvements is between Eighty Thousand ($80,000.00) and One Hundred Thousand Dollars ($100,000.00). If the company authorizes the opening of a second location, Sleenhof will provide a similar investment for the build-out of the second location. Any additional locations will not require the same initial investment from Sleenhof and the costs will be born by the corporation unless otherwise agreed in advance and in writing by all the Shareholders.

7.2     Lease Agreement.   The initial lease of the property at 328 11th Street, Huntington Beach, CA  92648 shall initially be held in the individual name of Sleenhof and thereafter transferred to the corporation. Bielo and Wyner will not be required to personally guarantee the lease but Sleenhof may be required to personally guarantee or have guaranteed the lease, which guarantee Sleenhof shall acquire on behalf or the corporation.

7.3     Intellectual Property.   As an additional initial investment, and in consideration of the build-out investment of Sleenhof, Bielo and Wyner agree to license the rights to use the name "CHRONIC TACOS" and to provide for the use of the restaurants intended herein, their trade secret Mexican food recipes, business systems, and names of suppliers ("Intellectual Property"), needed for conducting the business. It is understood and agreed that such license shall be royalty free and is for use in this company in its operations only while Bielo and Wyner are Shareholders therein and that no other Shareholder nor the company shall have, nor is intended to have, any other right to the intellectual property or the use thereof. Any use of these rights beyond those intended herein, shall be a material breech of this agreement and shall make the company and the other Shareholders liable for royalties and damages associated with the use of the Intellectual Property. In addition, it is agreed that any such use would be detrimental to the interests of Bielo and Wyner and their other operations and they are therefore entitled to injunctive relief along with any other remedies available to them at law or in equity.

7.4    Employment of Shareholders.    It is the intent of the parties that the Shareholder's be paid only when filling an operational position for the company. No Shareholder shall be hired by the company unless approved by a super majority of the Shares. Notwithstanding the foregoing, with this agreement, the Shareholders agree that Sleenhof will currently be employed to work as the corporation's manager of the store(s) until replaced by the Directors in the normal course of business. As salary for this position he will receive a salary of $2,000 [$3,000] per month.

7.5    Non Competition.    Sleenhof understands and agrees that this agreement and the operation of the corporation do not grant him any rights in the Intellectual Property or to use the Intellectual Property in any manner outside the operation of the corporation. Sleenhof also agrees that as an inducement for Bielo and Wyner to enter into this agreement, and to provide the Intellectual Property for the use of the corporation, he expressly agrees not to compete against the other Shareholders, or the corporation, in a Mexican restaurant format for 5 years from the later of his last date of employment or the last date of record of Sleenhof as a Shareholder, Director or Officer of the corporation and in no event shall he use the Intellectual Property described in Paragraph 7.3.

7.6    Other Associated Entities:    It is understood that the Shareholders or Directors currently, and in the future, may operate businesses with which the corporation may desire to contract for products and services. This agreement hereby allows such transactions when approved by a majority of disinterested Shareholders or Directors, or if in the case that all Shareholders and Directors feel they would be interested parties, by all the Shareholders or Directors. Specifically, the Corporation agrees to use the services of CHRONIC INDUSTRIES, INC., a separate of business of RANDALL WYNER, for obtaining silk screening services for the following items: t-shirts, hats, cups and stickers:

ARTICLE VIII
MISCELLANEOUS PROVISIONS

8.1    Complete Agreement.    This Agreement, and all exhibits hereto, constitutes the complete and exclusive agreement between the parties with respect to the subject matter hereof, and replaces and supersedes all prior and contemporaneous written or oral agreements or statements by and among the parties regarding the subject matter hereof.

8.2.    Binding Effect.    This Agreement will be binding upon and inure to the benefit of the parties, and their respective successors, legal representatives, and assigns.

8.3    Parties in Stock.    Except as expressly provided herein, nothing in this Agreement shall confer any right or remedies to any persons other than the parties hereto, and their respective successors and assigns, nor shall anything herein relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right or action over or against any party to this Agreement.

8.4    Interpretation and Jurisdiction.    This Agreement shall be construed in accordance with the laws of the State of California. Each party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California for any action arising out of or in connection with this Agreement. Each party further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail, and that when so made shall be as if served upon it personally within the State of California.

8.5     Dispute Resolution.     If a dispute arises out of any aspect of this Agreement between the Shareholders, or the breach of this Agreement, and if the dispute cannot be settled through negotiation, the Shareholders agree to discuss in good faith the use of mediation before resorting to arbitration, litigation, or other dispute resolution mechanisms. Notwithstanding the foregoing, any dispute which cannot be resolved by mediation shall be submitted to arbitration on the written request of one party after the service of that request on the other party. The parties shall each appoint one person to hear and determine the dispute. If these two arbitrators cannot agree, then the two arbitrators shall choose a third impartial arbitrator whose decision shall be final and conclusive on both parties. The cost of the arbitration shall be borne by the losing party or in such proportions as the arbitrators shall decide.

8.6     Severability.     If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid or unenforceable, it is hereby severed from this Agreement, and the remainder of the Agreement remains unaffected thereby. The parties agree that the severed provision shall be replaced with such other provision that most closely reflects the intent of the parties hereto and is enforceable.

8.7     Amendments.     All amendments or changes to this Agreement shall be in writing and signed by all parties. This Agreement may be modified, amended, superseded or canceled, and any terms, conditions, representations, warranties, or conditions herein waived, only by a written document executed by the party or parties to be bound by any such modification, amendment, cancellation, or waiver.

8.8     Multiple Counterparts.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

8.9     Attorney Fees.     In the event any dispute arises between the parties regarding this Agreement, or the enforcement of any provision herein, the prevailing party shall be entitled to recover its costs, expenses, discovery costs, and attorneys' fees incurred in connection with any such controversy, in addition to whatever other relief, if any, is granted to the prevailing party.

IN WITNESS of our agreement hereto, and our desire to be bound hereby, WE EXECUTE this Agreement as of the date first entered above.

By: _____
        Rob Sleenhof

By: _____
        Dan Bielo

By: _____
        Randall Wyner

## PROOF OF SERVICE

<u>CHRONIC TACOS ENTERPRISES, INC. v. CHRONIC TACOS HUNTINGTON BEACH, INC.</u>

U.S.D.C. CASE NO. SACVI0-01414 DOC (RNBx)

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is DEHNADI & CONLEY, LLP, One Park Plaza, Sixth Floor, Irvine, California 92614.

On November 12, 2010, I served the document(s) described as DEFENDANT CHRONIC TACOS HUNTINGTON BEACH, INC., ROB SLEENHOF AND LOES SLEENHOF'S ANSWER TO COMPLAINT AND COUNTERCLAIM OF CHRONIC TACOS HUNTINGTON BEACH, INC., CHRONIC TACOS CORONA DEL MAR, INC., ROB SLEENHOF AND LOES SLEENHOF; DEMAND FOR JURY TRIAL; SUMMONS; CERTIFICATION AND NOTICE OF INTERESTED PARTIES on the following interested parties:

| James M. Mulcahy, Esq.<br>MULCAHY LLP<br>One Park Plaza, Suite 225<br>Irvine, California 92614 | Plaintiff and Counterdefendant<br>CHRONIC TACOS ENTERPRISES,<br>INC. |
| --- | --- |

_X_   BY MAIL: I am readily familiar with DEHNADI & CONLEY, LLP's, business practice of collection and processing of correspondence for mailing. Under that practice, I placed true and correct copies of the document(s) specified above in sealed envelope(s) addressed to the parties, *via* their attorneys of record, at the addresses specified herein above. Pursuant to said practice, the envelope(s) are deposited with the U.S. Postal Service on the same day with postage fully prepaid at Irvine, California 92614. I am aware that on motion by a party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one (1) day after date of deposit specified herein.

_____   BY FACSIMILE: By facsimile to the number(s) specified above transmitted from facsimile number (949) 218-3635 in the ordinary course of business. The transmitting facsimile device issued transmission confirmation(s) that confirmed successful, errorless completion of the transmission(s) on the date specified above.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE ABOVE IS TRUE AND CORRECT AND THAT THIS WAS EXECUTED ON NOVEMBER 12, 2010, AT IRVINE, CALIFORNIA.

DECLARANT

## PROOF OF SERVICE